*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-CV-0700

MICHAEL PATRICK MURRAY, *et al*., APPELLANTS,

V.

MOTOROLA, INC., *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2001-CA-008479-B)

(Hon. Frederick H. Weisberg, Motions Judge)
(Hon. Anita Josey-Herring, Motions Judge)
(Hon. Alfred S. Irving Jr., Motions Judge)

(Argued January 14, 2025          Decided July 17, 2025)

*Jeffrey B. Morganroth* argued for appellants.

*Terrence J. Dee* argued for appellees.

Many additional counsel were on the briefs for the parties. Their names are listed in an appendix to this opinion.

Before EASTERLY, HOWARD, and SHANKER, *Associate Judges*.

SHANKER, *Associate Judge*: Michael Patrick Murray and the other plaintiffs in a total of thirteen consolidated cases, appellants here, are either individuals suffering from brain tumors or estates suing on behalf of decedents who died from

brain cancer, specifically gliomas and acoustic neuromas. Appellants initially sued Motorola, Inc. and several other telecommunications companies, appellees here, in 2001, alleging that long-term exposure to cell phone radiation caused their negative health outcomes. In the more than two-decade lifespan of this litigation, this is the third time this case has come to us on appeal.

In *Murray v. Motorola, Inc.*, 982 A.2d 764 (D.C. 2009) (*Motorola I*), we concluded that federal law did not completely preempt appellants' claims and allowed the litigation to proceed. In *Motorola Inc. v. Murray*, 147 A.3d 751 (D.C. 2016) (en banc) (*Motorola II*), we changed the evidentiary standard for admitting expert opinion testimony in this jurisdiction. Specifically, we abandoned the "general acceptance" test articulated in *Dyas v. United States*, 376 A.2d 827 (D.C. 1977), and *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), in favor of the "reliability" test set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702. *See Motorola II*, 147 A.3d at 757 (concluding that "Rule 702, with its expanded focus on whether reliable principles and methods have been reliably applied, states a rule that is preferable to the *Dyas/Frye* test"). We remanded the case for further proceedings consistent with our opinion. *Id.* at 759.

The present appeal concerns several trial judges' rulings post-remand denying appellants' motions to conduct additional discovery and add new experts, striking portions of appellants' supplemental expert reports, excluding the proffered opinion testimony of all of appellants' experts under Rule 702, and granting summary judgment in favor of appellees. Appellants argue that the trial judges erred in granting summary judgment and abused their discretion in their rulings leading up to summary judgment. For the reasons set forth below, we conclude that the trial judges did not err in granting summary judgment in favor of appellees and properly exercised their discretion in their various other rulings. We therefore affirm.

## I. Background

We begin with an order that predates our remand in *Motorola II* and that appellants do not challenge on appeal: a case management order Judge Franklin Burgess, Jr. issued in 2011. Central to appellants' challenge is whether the subsequent trial judges correctly interpreted that order in making their rulings post-remand.

### A. Judge Franklin Burgess, Jr.'s December 7, 2011, Initial Case Management Schedule for Phase 1 Discovery

Judge Burgess convened the parties to determine a path forward in this complex, consolidated, toxic torts litigation involving over a dozen plaintiffs. At the

time, as remains true today, no American court had allowed a lawsuit alleging that cell phone radiation caused brain tumors to go before a jury, all concluding that the widespread scientific consensus did not support such a claim. Judge Burgess held a hearing in November 2011 to determine how to proceed with discovery in light of the causation issues presented in the case. Judge Burgess asked the parties to "[p]ut . . . aside" the standard for admitting expert opinion testimony so that he could focus on understanding the nuances of these causation issues. The parties explained that the case entailed two types of causation: general causation and specific causation. General causation focuses on "whether the non-ionizing radiation from cell phones has a non-thermal effect that causes, promotes, or accelerates the growth of brain tumors, specifically gliomas and acoustic neuromas." Specific causation, by contrast, focuses on whether, on a case-by-case basis, cellphone radiation caused the brain tumors and brain cancer from which each appellant suffered.

With this understanding in mind, Judge Burgess issued the scheduling order governing discovery. The first phase of discovery would address general causation, and only if appellants prevailed on their general causation theory would discovery proceed to a second phase that would address specific causation. If appellants could not get admissible expert testimony on their general causation theory before a jury, then the case would be over, with appellees prevailing pretrial, avoiding the time and expense of full-blown discovery and litigation.

Judge Burgess's scheduling order tracked Superior Court Rule of Civil Procedure 26(a)(2)(B), which governs the disclosure of expert witness testimony. Judge Burgess's order reads in relevant part:

> Disclosure of [parties'] experts and reports on general causation. Expert reports will include (i) a complete statement of all opinions the witness will express on general causation and the basis and reasons for them; (ii) the facts or data considered by the expert in forming the opinions; (iii) the witness's qualifications, including a current CV; (iv) a list of all other cases in which the witness has testified in the previous four years; and (v) a statement of the compensation to be paid for the expert's work on the case.

Accordingly, Judge Burgess required both parties to produce "a complete statement of *all* opinions the[ir] witness[es] w[ould] express on general causation and the basis and reasons for them" by the deadlines set forth in the order (emphasis added). Appellants do not challenge that order on appeal.

We now turn to the trial court's proceedings after our remand in *Motorola II*, reviewing each of the rulings that appellants challenge on appeal.

### B.     Judge Frederick H. Weisberg's March 16, 2017, Order Denying Appellants' Motion for Additional Discovery

After we sent this case back to the trial court following our adoption of the *Daubert*/Rule 702 framework in this jurisdiction, appellants moved for additional discovery and to add new experts, including discovery seeking appellees' internal

documents, arguing that the adoption of Rule 702 "open[ed] up the door" to such a result. Appellees countered that while the standard for admitting expert opinion testimony had changed, the science had not changed, except for new studies and peer-reviewed research published since February 2013, the deadline for appellants' experts' original reports. Accordingly, appellees contended that any potential prejudice to appellants due to the change from *Dyas*/*Frye* to Rule 702 could be cured by permitting appellants' existing experts to supplement their reports based on any new scientific developments since 2013 but that additional discovery and the addition of new experts was unwarranted.

Judge Frederick H. Weisberg denied appellants' motion. He explained that the "change from *Dyas*/*Frye* to Rule 702 d[id] not change the [trial] court's plan for the management of" the case because the court's "case management orders . . . were not based on the standard for admissibility of expert testimony." Judge Weisberg relied in part on Judge Burgess's case management order, explaining that appellants should be limited to the experts they had already named because Judge Burgess required them to produce "all" of their general causation expert witnesses and the opinions they proffered. Judge Weisberg also stated that Judge Burgess's order had been "entered without regard to the applicable standard on the admissibility of expert testimony . . . and was the same language that would have been used in a comparable order from a federal district court operating under Rule 702. *See* Federal Rule of

Civil Procedure 26(a)(2)(B)(i)." Moreover, Judge Weisberg explained, "the science that determine[d] both acceptance and reliability [had] remain[ed] the same" (except for new science) such that "there [wa]s no occasion for new experts to be named or for expanding the scope of Phase I discovery." Judge Weisberg also opined that "[i]f [appellants] c[ould] not qualify an expert on general causation based on existing science, and if summary judgment were to follow from that failure, it . . . would be because on the issue of general causation . . . [,] [they] ha[d] failed to proffer and qualify *any* expert after having been given a full and fair opportunity to do so."

Judge Weisberg further explained that the question guiding the court's management of the phased discovery process had remained constant, which was whether appellants had "admissible expert testimony on the general causation issue." Judge Weisberg then stated:

> There are only two reasons that question cannot be answered under the new standard on the present record: (1) there may be scientific studies done after the experts submitted their reports for the Phase I litigation, which may support or undermine the opinions of [Appellants'] experts under the new standard, and the experts should be permitted to supplement their opinions accordingly; and (2) [Appellants'] experts rendered their initial opinions in the *Dyas/Frye* regime; and, although their opinions would not change simply because the legal standard for admissibility has changed, it is at least conceivable that some might articulate their opinions differently if they were called upon to address reliability of scientific principles and methods reliably applied to the facts of

these cases, as required by Rule 702, and not merely the general acceptance of their respective methodologies.

Accordingly, Judge Weisberg, while denying the motion for additional discovery and to add new experts, permitted both parties' existing experts to supplement their reports to "(1) address[ ] any relevant studies or peer reviewed publications that ha[d] been added to the scientific literature since" 2013, and "(2) revis[e] the way they express[ed] their opinions to account for the change in the evidentiary standard from *Dyas/Frye* to Federal Rule 702, provided they explain[ed] why the change in the evidentiary standard necessitat[ed] a change in the way they articulate[d] their opinion." Judge Weisberg also observed that it was "at least possible that one or more of the experts the court excluded under *Dyas/Frye* could be admitted under Rule 702" but "le[ft] that issue to be resolved by the judge currently assigned, if the parties [we]re unable to reach [an] agreement."

### C. Judge Anita Josey-Herring's August 28, 2018, Superseding Amended Order Granting in Part Appellees' Motion to Strike Unauthorized Portions of Supplemental Expert Reports and Related Orders

After appellants submitted their supplemental expert reports, appellees moved to strike portions of those reports on the grounds that appellants violated Judge Weisberg's order by "(1) relying heavily on pre-2013 studies that they could have but failed to rely on in their original reports; and (2) revising how they express[ed] their original methodologies and opinions without even attempting to explain why

the [n]ew Rule 702 admissibility standard require[d] such revision." Judge Anita Josey-Herring, who had taken over the case from Judge Weisberg, largely granted appellees' motion. Judge Josey-Herring found that while Judge Weisberg's order "permitted limited supplementation to address the change in the evidentiary standard," it "did not authorize . . . a re-do of expert discovery" or "seek to give the parties an unfair opportunity to counter the [c]ourt's previous evidentiary findings after the fact." Judge Josey-Herring also found that appellants failed to explain why their experts needed to revise their opinions based on the change from *Dyas*/*Frye* to Rule 702. Accordingly, Judge Josey-Herring struck the challenged portions of the expert supplemental reports because they (1) raised new opinions, (2) incorporated studies published before 2013 that were not included in their original reports, or (3) failed to explain how the change from *Dyas*/*Frye* to *Daubert* necessitated revising their original opinions. Judge Josey-Herring, at the same time, permitted supplementation when it was consistent with the strictures of Judge Weisberg's order. We review Judge Josey-Herring's findings regarding each of appellants' proffered experts.

*Dr. Laura Plunkett*

Judge Josey-Herring found that Dr. Laura Plunkett sought to add a new general causation opinion that "far surpassed the scope of her original report"

because she had previously "offered no causation opinions." Judge Josey-Herring explained that Dr. Plunkett's effort to offer this new opinion contravened a prior ruling from Judge Weisberg that, while Dr. Plunkett was qualified to serve as a "support witness" who could offer testimony to validate the methodologies of other experts, she "was prohibited 'from testify[ing] on the ultimate issue of whether radiation from cell phones can cause or promote glioma or acoustic neuroma.'"

Judge Josey-Herring also found that appellants, in attempting to justify Dr. Plunkett's changes, "merely articulated general propositions which [we]re substantively lacking" and offered "conclusory assertions" that "f[e]ll short of providing the [c]ourt with an adequate basis for evaluating why the change in the evidentiary standard . . . necessitated that Dr. Plunkett revise the opinions she expressed in her original report." Accordingly, Judge Josey-Herring struck the new general causation opinions from Dr. Plunkett's supplemental report.

Judge Josey-Herring, at the same time, permitted Dr. Plunkett to refer to the studies consistent with her role as a support witness.

*Dr. Abraham Liboff*

Judge Josey-Herring struck several studies included in Dr. Abraham Liboff's supplemental report that bore no relationship to his original report, reiterating that

supplementation "was not intended to permit [appellants] to elicit new opinions not previously raised" or allow discovery to became "a moving target." Specifically, Judge Josey-Herring struck studies that Dr. Liboff relied on in his supplemental report to support new opinions on the adverse health effects of mobile phone use, brain tumor incidence data, and interfacial water. Judge Josey-Herring also struck studies that Dr. Liboff included in a new section on epidemiology on the grounds that that he "neither mention[ed], reference[ed], nor relie[d] on any epidemiological studies" in his original report, save for a "cursory" and "brief" reference that "fail[ed] to justify the supplementation of an entire section devoted to epidemiological studies."

Regarding revisions to Dr. Liboff's original opinions, Judge Josey-Herring found that appellants "opted to cursorily state that the opinions in Dr. Liboff's supplemental report met the Rule 702 standard" "[r]ather than argu[e] that the unique factors of *Daubert* justified the revision of certain portions of Dr. Liboff's supplemental report." Judge Josey-Herring thus found that appellants "failed to adequately demonstrate that the change in evidentiary standard justified a change in how Dr. Liboff originally articulated his opinions."

Judge Josey-Herring did, however, permit Dr. Liboff to reference the epidemiological studies provided that such references were consistent with his

original report.  Judge Josey-Herring also denied appellees' motion to strike studies included in Dr. Liboff's supplemental report relating to reactive oxygen species, permitting Dr. Liboff to use the studies where they "adequately supplement[ed]" an opinion in his original report.

*Dr. Michael Kundi*

Judge Josey-Herring struck numerous studies included in Dr. Michael Kundi's supplemental report because Dr. Kundi relied on them to support several new opinions that he had not previously offered.  Judge Josey-Herring reiterated that Judge Weisberg's supplementation order did not permit appellants to "make additions to Dr. Kundi's report under the pretense of supplementation" so as to go "outside the scope" of his original expert report and thereby "restart discovery."  She thus struck his new opinions on recall bias, meta-analysis, dose-response in epidemiology, specificity, selection bias, and cofounding.

Regarding revisions to Dr. Kundi's original opinions, Judge Josey-Herring found that appellants, rather than justifying how the change in the evidentiary standard necessitated a change in how Dr. Kundi previously articulated his opinions in his original report, "merely provided the [c]ourt with vague and conclusory statements that the [c]ourt found unpersuasive."

As to studies relating to Dr. Kundi's opinion relating to the quality of official cancer registries that appellees challenged, Judge Josey-Herring denied appellees' motion to strike insofar as Dr. Kundi's use of the studies was consistent with an opinion stated in his original report.

*Dr. Igor Belyaev*

Judge Josey-Herring granted in part, denied in part, and held in abeyance in part appellees' motion to strike Dr. Igor Belyaev's supplemental report. For purposes of clarity, she struck the wholesale inclusion of Dr. Belyaev's original report in his supplemental report. Judge Josey-Herring also struck several new studies on the grounds that the portion of Dr. Belyaev's original report that appellants claimed justified including those studies consisted of no more than a blank line. Furthermore, Judge Josey-Herring struck Dr. Belyaev's references to the "Bradford Hill" criteria in his supplemental report because the Bradford Hill study was published more than fifty years ago yet Dr. Belyaev did not refer to it in his original report. Indeed, he had previously testified before Judge Weisberg that "nowhere in his [original] report did he 'use the words Bradford Hill.'" Judge Josey-Herring also struck a section of Dr. Belyaev's supplemental report that included a new opinion about brain cancer time trends that was not part of his original report. In striking that section, Judge Josey-Herring noted that several studies included in

that section were neither included in Dr. Belyaev's original report nor published after 2013. Finding that including those studies violated Judge Weisberg's order, she struck them as well.

She also found that appellants failed to justify how the change in the evidentiary standard necessitated the inclusion of Dr. Belyaev's new opinion. Finally, pending an evidentiary hearing, Judge Josey-Herring held in abeyance appellees' request to strike several sections and subsections in Dr. Belyaev's supplemental report that appellees alleged were new opinions.

After holding the evidentiary hearing, Judge Josey-Herring granted in part and denied as moot in part appellees' motion to strike several studies included in Dr. Belyaev's supplemental report. From the outset, Judge Josey-Herring emphasized, once again, that Dr. Belyaev's supplemental report was "bound by the scope of topics covered in his original report" because Judge Weisberg's supplementation order did not "authorize[ ]" the parties "to re-do Phase I expert discovery in this case." Accordingly, Dr. Belyaev was "only permitted to supplement those opinions and topics covered in his original report" and was "not permitted, under the pretext of supplementation, to include . . . entirely new opinions not previously included in his original report . . . or . . . studies and topics that Dr. Belyaev could have—but didn't—include or address in his original 2013

Report." As a result, Judge Josey-Herring struck numerous studies included in Dr. Belyaev's supplemental report because Dr. Belyaev relied on them to support opinions not declared in his original report, including opinions on the effect that a cellphone's positioning has on brain cancer development, brain cancer latency, how animal studies shed light on chronic exposure to radiation from cell phones, how human studies shed light on chronic exposure to radiation from cell phones, extremely low frequency fields, and protein conformation.

Judge Josey-Herring also found that appellants failed to justify how any of the newly included studies were necessitated by the change from *Dyas*/*Frye* to *Daubert*, finding that appellants "merely provided the [c]ourt with . . . generic and conclusory statements."

Judge Josey-Herring denied as moot portions of appellees' motion to strike several studies included in Dr. Belyaev's supplemental report given that she had previously struck the challenged studies in her August 28, 2018, order because the studies supplemented a blank line.

### *Dr. Dimitris Panagopoulos*

Judge Josey-Herring struck several studies that Dr. Dimitris Panagopoulos included in his supplemental report because he relied on them to support numerous

opinions not previously asserted, including opinions relating to real exposures compared to simulated exposures, polarization, positive versus negative studies, and tumor promotion in mice. She also struck several pre-2013 studies that Dr. Panagopoulos referenced for the first time in his supplemental report where he could have, but failed to, reference them in his original report.

Judge Josey-Herring also found that appellants failed to justify the revisions in Dr. Panagopoulos's original expert report. Specifically, she found that appellants made a "vague reference to 'reliability factors'" instead of demonstrating how the revisions in Dr. Panagopoulos's expert report "arose directly out of the change in the evidentiary standard."

Judge Josey-Herring, at the same time, denied appellees' request to strike Dr. Panagopoulos's opinion regarding actin cytoskeleton damage because, while he had partially expanded his opinion in his supplemental report, Dr. Panagopoulos had opined on the phenomenon in his original report. She also denied appellees' request to strike studies related to Dr. Panagopoulos's opinion on comparing effects from studies on radiofrequency and power frequency exposures because he had briefly discussed the topic in his original report.

*Dr. Wilhelm Mosgoeller*

Judge Josey-Herring struck several studies that Dr. Wilhelm Mosgoeller included in his supplemental report because he relied on them to support new opinions that he had not offered in his original report. Judge Josey-Herring emphasized that Judge Weisberg's order "did not permit the parties to restart the discovery process," especially given that the initial case management order required expert witnesses to disclose "a complete statement of *all* opinions" (emphasis added). She thus struck new opinions on DNA repair induction, epidemiology, co-carcinogenicity, and oxidative DNA damage.

As to the opinion about epidemiology, Judge Josey-Herring permitted Dr. Mosgoeller to revise his expert report to clarify how his methodology met Rule 702's reliability standard but otherwise precluded him from adding a new opinion that he "had the opportunity to discuss in his original report but ultimately neglected to cover." With respect to Dr. Mosgoeller's opinion regarding oxidative DNA damage, Judge Josey-Herring struck it without prejudice after appellants conceded that Dr. Mosgoeller's theory was "available pre-2013," but she nonetheless granted appellants leave to further brief the issue.

After receiving supplemental briefing, Judge Josey-Herring upheld her decision to strike Dr. Mosgoeller's opinion regarding oxidative DNA damage. She

was unpersuaded by appellants' contention that the 2016 study they relied on to support this new opinion was so "groundbreaking" that it "finally 'spurred'" Dr. Mosgoeller to "agree with a theory that he previously failed to include in his original report." Accordingly, she concluded that appellants failed to "justify the wholesale inclusion of" a new opinion raised for the first time in a supplemental report.

*New Pre-February 2013 Studies*

Finally, Judge Josey-Herring struck all studies published before 2013 that were cited by appellants' experts for the first time in their supplemental reports. She did so because including those studies violated Judge Weisberg's order, which permitted limited supplementation with studies published *after* 2013 that properly supplemented the experts' original opinions.

Although she struck all pre-2013 studies that were cited by an expert for the first time in their supplemental report, Judge Josey-Herring nonetheless permitted appellants' experts to cite to or reference a new pre-2013 study if the study was necessary to "meaningfully discuss[ ]" or provide context to a post-2013 study.

### D. Judge Josey-Herring's July 3, 2019, Order Denying Appellants' Motion for Reconsideration

Appellants, citing Superior Court Rule of Civil Procedure 60(b)(1) & Rule 60(6), moved Judge Josey-Herring to reconsider her entire order striking portions of

their supplemental expert reports, including her decision to strike any post-February 2013 studies; all newly cited pre-February 2013 studies and related topics; and specific studies and opinions contained in the supplemental expert reports of Drs. Liboff, Panagopoulos, Kundi, Plunkett, Belyaev, and Mosgoeller. Judge Josey-Herring noted that Rule 60(b) does not permit parties to move for reconsideration but rather allows a party to seek relief from a final judgment, order, or proceeding due to "mistake, inadvertence, surprise, or excusable neglect" or "any other reason that justifies relief." Super. Ct. Civ. R. 60(b)(1) & (6). After nevertheless addressing appellants' arguments for reconsideration, Judge Josey-Herring denied the motion after finding their arguments to be "unpersuasive or without merit."

Appellants had argued, for the first time, that all of the stricken post-February 2013 studies and opinions were properly included in their supplemental expert reports under Rule 26(a)(2)(B) and Rule 26(e), which govern the disclosure of expert witness testimony. Judge Josey-Herring, after noting that the scope of expert supplementation was "explicitly limited" to "avoid the credible prejudice that would occur if the [c]ourt allowed for the wholesale reopening of Phase I discovery," found that appellants "failed to demonstrate that Rule 26(a)(2)(B) and/or Rule 26(e) provide[d] [them] with the unfettered ability to supplement their expert reports with any post-February 2013 study and related opinion." She also noted that Rule 26's disclosure requirements were "explicitly predicated on the absence of a court order

stating otherwise." Accordingly, given that Judge Weisberg's order explicitly defined the bounds of expert supplementation, Judge Josey-Herring found that appellants' "reliance on Rule 26 [wa]s misplaced and without merit."

She also noted that she was "not of the view that Rule 26 permits a party to upend the discovery process to gain an unfair tactical advantage and thereby disregard[ ] other discovery rules and applicable deadlines." Judge Josey-Herring found that appellants' arguments failed to satisfy Rule 60(b)'s standard for relief from judgment because they failed to show how her decision to strike certain post-February 2013 studies was the result of "mistake, inadvertence, surprise, or excusable neglect" or "any other reason that justifie[d] relief." Super. Ct. Civ. R. 60(b)(1) & (6). She therefore declined to reconsider her decision to strike several post-February 2013 studies that were included in the supplemental expert reports.

Judge Josey-Herring likewise denied appellants' request that she reconsider her decision to strike all pre-February 2013 studies that appellants' experts cited for the first time in their supplemental reports. She found that all of appellants' arguments had previously been addressed in her original order to strike, save for a new argument predicated on Rule 26, which, as stated above, she found unavailing. Moreover, Judge Josey-Herring found that appellants failed to show that her decision

to strike the studies was the result of a mistake or any other reason warranting post-judgment relief under Rule 60(b)(1) & (6).

Finally, Judge Josey-Herring declined to reconsider striking specific studies and opinions contained in the supplemental expert reports of Drs. Liboff, Panagopoulos, Kundi, Plunkett, Belyaev, and Mosgoeller. With respect to each of the experts, she found that appellants "merely repackage[d] and/or restate[d] arguments previously raised and subsequently denied by the [c]ourt" or otherwise found their new arguments to be "without merit." She was also "unpersuaded by [appellants'] cursory invocation of the *Daubert* standard to justify the inclusion of any of the previously mentioned studies and/or opinions" and found that they failed to show mistake or another justification under Rule 60(b)(1) & (6). Accordingly, Judge Josey-Herring denied appellants' motion for reconsideration.

### E. Judge Alfred S. Irving, Jr.'s April 21, 2021, Order Denying Appellants' Motion for Leave to Add a General Causation Expert to Phase I of Discovery; January 6, 2022, Oral Ruling Denying Motion for Reconsideration; and Oral Rulings Denying Appellants' Requests for Reconsideration of Expert Reports During September 2022 *Daubert* Hearing

Appellants next moved for leave to add Dr. Christopher J. Portier as a general causation expert, which Judge Alfred S. Irving, Jr., the new presiding judge, denied. Judge Irving observed that Judge Weisberg's order denying appellants' motion for

additional discovery and the addition of new experts "directly and definitively answered the question whether [appellants] should be allowed to name additional experts." Specifically, he observed that the order "limited [appellants] to the experts they ha[d] already named" while allowing the parties' existing experts to supplement their reports to consider any new science since 2013 and any revisions in how they expressed their opinions necessitated by the change from *Dyas/Frye* to Rule 702. Judge Irving also referenced a separate 2017 scheduling order which "confirmed that 'there [was] no occasion for new experts to be named and [that] the scope of discovery [was] not to be expanded.'"

Moreover, Judge Irving observed that, after the parties submitted their supplemental expert reports, Judge Josey-Herring, in striking large portions of appellants' supplemental expert reports, "explain[ed] that the 'supplementation was not intended to permit [appellants] to elicit new opinions not previously raised.'" Accordingly, in denying the motion, Judge Irving found that appellants "fail[ed] . . . to present the[ir] request within the context of Judge Weisberg's and Judge Josey-Herring's admonitions that the scope of Phase I discovery was not to be expanded and that 'there [wa]s no occasion for new experts to be named.'" Judge Irving thus found that "allowing Dr. Portier to present expert testimony would expand the scope of Phase I discovery in contravention of prior well-reasoned court

rulings." Finding that there was "no reason to diverge from th[ose] rulings," he denied the motion.

Ruling in the alternative, Judge Irving found unpersuasive appellants' invocation of our decision in *Tisdale v. Howard Univ.,* 697 A.2d 53 (D.C. 1997), and stated that he would have denied the motion on that ground as well. In *Tisdale*, 697 A.2d at 54 n.1, and *Abell v. Wang*, 697 A.2d 796, 801 (D.C. 1997), we set forth five factors for a trial court to consider when determining whether to allow a party to file a Rule 26(b)(4) statement out of time, including:

> (1) whether allowing the evidence would incurably surprise or prejudice the opposite party; (2) whether excluding the evidence would incurably prejudice the party seeking to introduce it; (3) whether the party seeking to introduce the testimony failed to comply with the evidentiary rules inadvertently or willfully; (4) the impact of allowing the proposed testimony on the orderliness and efficiency of the trial; and (5) the impact of excluding the proposed testimony on the completeness of information before the court or jury.

Judge Irving explained that, while he found that a "*Tisdale* analysis [wa]s wholly unnecessary," he nonetheless "would find that [appellants'] failure to acknowledge and distinguish the prior court rulings when evaluating the first factor [wa]s fatal" because "[h]aving already spent years debating the issue and having received multiple decisions finding in their favor, [appellees] would be greatly prejudiced were the [c]ourt to issue an order directly circumventing Judge

Weisberg's and Judge Josey-Herring's prior orders." He also stated that "allowing Dr. Portier's testimony four months before the *Daubert* hearing is scheduled to begin would disrupt the existing schedule and detrimentally affect the orderliness and efficiency of any trial."

At a January 6, 2022, status hearing convened to schedule a *Daubert* hearing, appellants asked Judge Irving to reconsider his order denying their motion for leave to add Dr. Portier. Appellants argued that Dr. Portier "may well replace the need for one or two of the foreign witnesses that [they were] going to have logistic[al] problems with." Appellees opposed the motion, contending that appellants were seeking a "do-over" after multiple judges had already rejected their previous efforts to add more expert witnesses. Judge Irving denied the motion for reconsideration, stating that he would "decline the request for the reasons already articulated in [his] latest order in that regard."

During the nearly three-week *Daubert* hearing held in September 2022, appellants once again requested reconsideration of the rejection of their expert reports, which Judge Irving denied. He reasoned in part that the law of the case governed such that the expert testimony should be in keeping with Judge Weisberg's and Judge Josey-Herring's prior decisions.

**F.    Judge Irving's April 25, 2023, Order Granting Appellees'
Motion to Exclude Appellants' Expert Testimony and
August 1, 2023, Final Judgment Order**

Judge Irving excluded the testimony of all of appellants' expert witnesses

under Federal Rule of Evidence 702, which at the time he applied the rule read as

follows:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify in the
> form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and
> methods; and
>
> (d) the expert has reliably applied the principles and
> methods to the facts of the case.[1]

---

[1] The most recent version of Federal Rule of Evidence 702 reads as follows:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify in the
> form of an opinion or otherwise if the proponent
> demonstrates to the court that it is more likely than not
> that:
>
> (a) the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

We now set forth Judge Irving's findings with respect to each of the excluded experts.

*Dr. Kundi*

After recounting Dr. Kundi's educational and professional credentials, Judge Irving qualified Dr. Kundi, a retired professor of epidemiology and occupational health, under Rule 702(a) because his scientific knowledge "would 'help the trier of fact to understand the evidence or to determine a fact in issue.'" Judge Irving also noted that appellees did not object to Dr. Kundi's qualifications. Judge Irving, however, excluded Dr. Kundi's testimony under Rule 702(b)-(d) after finding that Dr. Kundi's three-step methodology, known as the "Pragmatic Dialogue Approach," did not pass muster. Specifically, Judge Irving found that at various stages of his methodology, Dr. Kundi (1) failed to provide sufficient facts and data to support his opinions that a cause-effect relationship existed between mobile phone use and acoustic neuromas and gliomas, (2) failed to control for bias, and (3) failed to properly apply the Bradford Hill nine-factor criteria for determining a causal association. Concluding that Dr. Kundi's testimony suffered from "the fatal flaw"

---

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

of "too great an analytical gap between the data and the opinion proffered," Judge Irving excluded his testimony under Rule 702(b)-(d).

*Dr. Belyaev*

Judge Irving found Dr. Belyaev, a cancer research scientist, not qualified under 702(a), noting that he "concede[d] that he [was] not an expert on acoustic neuroma and glioma" or on whether cellphone radiation can cause those specific tumors. Judge Irving therefore found that Dr. Belyaev "fail[ed] to provide a [relevant] causation opinion . . . to a reasonable degree of scientific certainty" such that his scientific knowledge would not help the trier of fact understand the causation issues in the case.

Judge Irving went on to evaluate Dr. Belyaev's testimony under Rule 702(b)-(d). He observed that Dr. Belyaev asserted that, in forming his opinions and conclusions, he used a methodology adopted by the International Agency for Research on Cancer (IARC). After discussing the IARC methodology in detail, Judge Irving concluded that it was "unclear" whether Dr. Belyaev in fact used the IARC methodology in his original report because he "merely assert[ed] that he used the process of the IARC methodology to come to his conclusion without elaboration."

Judge Irving also stated that it did not appear that Dr. Belyaev "reliably applied the IARC methodology because he failed to analyze the epidemiology, which he appreciated was the 'main component that drives the general causation conclusion.'" Moreover, Judge Irving found that Dr. Belyaev's opinion was not supported by sufficient facts and data and that he failed to apply reliable principles and methods because, while he claimed to have reached his opinion by using replication studies, a method of independently verifying the results of a previous study, he in fact had relied upon studies that were not replicated. Judge Irving therefore excluded his testimony.

### Dr. Mosgoeller

Judge Irving found that the specialized knowledge of Dr. Mosgoeller, a histologist and cell biologist, qualified him under Rule 702(a) to testify on matters specific to his field of research, but concluded that he could not testify more broadly about general causation. Judge Irving reasoned that "there would be an analytical gap, unsupported by facts and data, between Dr. Mosgoeller's opinion on causation and the issue in this case whether cell phone radiation specifically causes acoustic neuromas and gliomas." Accordingly, Judge Irving limited Dr. Mosgoeller's opinion testimony such that it could be only a "building block" for appellants' overall causation theory.

Moving on to Rule 702(b)-(d), Judge Irving found that Dr. Mosgoeller's testimony was not based on sufficient facts or data, was not the product of reliable principles and methods, and did not reliably apply principles and methods to the facts of this case. Specifically, Judge Irving, in recognizing that "general acceptance can . . . have a bearing on the [reliability] inquiry," *Motorola II*, 147 A.3d at 758 (quoting *Daubert*, 509 U.S. at 594), noted that Dr. Mosgoeller had "acknowledged" that his proffered testimony—that electromagnetic fields from cell phones are a cause of cancer in humans—was "not generally accepted within the scientific community." In fact, Judge Irving found that Dr. Mosgoeller's views were in the "distinct minority," which "raise[d] a red flag whether he faithfully applied a reliable method."

Judge Irving also found that Dr. Mosgoeller's opinion suffered from "analytical gaps" because his professed theory did not support a causal link between cell phone use and acoustic neuromas or gliomas. Moreover, Judge Irving found that Dr. Mosgoeller did not reliably apply his methodology, known as the "weight-of-the-evidence," to his literature review because he failed to explain his scientific method for weighing the evidence. Accordingly, Judge Irving excluded his testimony.

*Dr. Liboff*

Judge Irving found that Dr. Liboff, a physicist and molecular biologist, did not offer an opinion on general causation and, therefore, his testimony was irrelevant and would not help the trier of fact understand the evidence or determine the general causation question at issue in the case. Judge Irving thus excluded his testimony under Rule 702(a).

Turning to Rule 702(b)-(d), Judge Irving found that although Dr. Liboff testified that he adhered to the replication method to independently verify experimental studies when implementing his methodology for his literature reviews, he had failed to provide specifics regarding replication or explain why his opinions were not shared by others in the scientific community. Concluding that Dr. Liboff's opinions were not based on sufficient facts or data, or the product of reliable principles and methods, reliably applied, Judge Irving excluded his testimony on those grounds as well.

*Dr. Panagopoulos*

Judge Irving found that the opinion of Dr. Panagopoulos, a biophysicist—that "it is more probable than not that cell phone radiation causes adverse health effects in humans"—was "simply not relevant" to the general causation question because

he did not opine on gliomas or acoustic neuromas, the specific brain tumors at issue in the case. In fact, Dr. Panagopoulos conceded that "he does not speak to brain cancer in [his] expert report." Accordingly, Judge Irving concluded that Dr. Panagopoulos's testimony neither was relevant nor would help the factfinder understand an issue in the case, and Judge Irving thus excluded his testimony under Rule 702(a).

Under Rule 702(b)-(d), Judge Irving ruled that Dr. Panagopoulos's methodology, which entailed exposing fruit flies to cell phone radiation, was not a reliable principle or method because Dr. Panagopoulos failed to explain how his fruit-fly-exposure method could be extrapolated to humans, especially with respect to how the effects on the fruit flies related to cancer in humans in general, much less the specific brain cancers of gliomas and acoustic neuromas. Accordingly, Judge Irving excluded his testimony.

### *Dr. Plunkett*

Judge Irving found that Dr. Plunkett did "not offer a general causation opinion that cell phone radiation causes glioma or acoustic neuroma." Instead, Judge Irving viewed Dr. Plunkett as a "support witness" whose testimony served only to validate the methodologies of appellants' other experts. Given that he had excluded all of those experts, Judge Irving concluded that Dr. Plunkett's opinions as a support

witness would not be relevant. Accordingly, Judge Irving excluded her testimony under Rule 702(a).

## G. Final Judgment Order

Based on an agreement among the parties that summary judgment was appropriate given that Judge Irving had excluded the testimony of all of appellants' experts, Judge Irving granted summary judgment in favor of appellees under Super. Ct. Civ. R. 56(f). Appellants timely appealed.

## II. Analysis

Appellants argue that the trial judges erred in granting summary judgment and abused their discretion in their various rulings managing the discovery process and excluding their expert witnesses under Rule 702. In their view, the judges' belief that Judge Burgess's case management order "was entered without regard to the applicable standard on the admissibility of expert testimony" "was clearly incorrect inasmuch as Judge Burgess was clear" that he wanted the parties to "'put *Daubert* aside' and strictly focus on the *Frye/Dyas* general acceptance standard." They complain of the "prejudice . . . suffer[ed]" due to the change in the evidentiary standard. And appellants assert that "[e]ach of Judge Irving's findings" under Rule 702 "was clearly erroneous . . . especially if [the expert witness's] full opinions and report[s] had not been erroneously excluded." We conclude that the trial judges

properly exercised their discretion in their rulings managing discovery and applying Rule 702 and that Judge Irving appropriately granted summary judgment. We therefore affirm.

## A.    Standard of Review

We review the trial court's discovery and evidentiary rulings for abuse of discretion. *See Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 717 (D.C. 2013) ("The trial judge has broad discretion in managing the conduct of a trial, including the manner in which a witness gives testimony."); *cf. Hechinger Co. v. Johnson*, 761 A.2d 15, 23 (D.C. 2000) ("The decision whether to allow a lay witness to testify who has not been identified as a witness in a pretrial order is within the sound discretion of the trial court, and its decision will not be disturbed absent an abuse of discretion."). A trial court's admission or exclusion of expert testimony under Rule 702 is reviewed for abuse of discretion as well. *Motorola II*, 147 A.3d at 755 ("Rule 702 grants the [trial] judge the discretionary authority, reviewable for its abuse, to determine reliability in light of the particular facts and circumstances of the particular case." (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158 (1999))).

In conducting our review, we "must determine whether the decision maker failed to consider a relevant factor, whether [the decision maker] relied upon an

improper factor, and whether the reasons given reasonably support the conclusion." *Crater v. Oliver*, 201 A.3d 582, 584 (D.C. 2019) (internal quotation marks omitted). The trial court must make "an informed choice . . . drawn from a firm factual foundation." *Brooks v. United States*, 993 A.2d 1090, 1093 (D.C. 2010) (citation modified). Our "role in reviewing the exercise of discretion is supervisory in nature and deferential in attitude." *In re Z.W.*, 214 A.3d 1023, 1037 (D.C. 2019) (internal quotation marks omitted). Nevertheless, "[a] court by definition abuses its discretion when it makes an error of law." *Vining v. District of Columbia*, 198 A.3d 738, 754 (D.C. 2018) (internal quotation marks omitted). We must thus be assured that the trial court grounded its decision in the "correct legal principles." *Jones v. United States*, 17 A.3d 628, 631 (D.C. 2011) (internal quotation marks omitted).

"We review a trial court's grant of summary judgment de novo." *Mancuso v. Chapel Valley Landscape Co.*, 318 A.3d 547, 553 (D.C. 2024). Accordingly, we affirm summary judgment only if we are satisfied that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Jones v. NYLife Real Est. Holdings, LLC*, 252 A.3d 490, 494 (D.C. 2021) (internal quotation marks omitted). When making this determination, we "view the record in the light most favorable to the [nonmovant]" and grant the nonmovant "all favorable inferences which may reasonably be drawn from the evidentiary materials." *Tolu v.*

*Ayodeji*, 945 A.2d 596, 601 (D.C. 2008) (per curiam) (internal quotation marks omitted).

## B.    Discussion

We perceive no abuse of discretion in any of the trial judges' case management and discovery orders. The judges consistently applied the correct legal principles; we see no indication in the record that the judges failed to consider a relevant factor or relied upon an improper factor; and the reasons provided by the judges reasonably support their conclusions.

We note at the outset that in a world of ever-evolving scientific developments, discovery cannot be allowed to proceed indefinitely. There must be a limiting principle. Otherwise, parties would be able to create the very "moving target" that Judge Josey-Herring presciently warned against. Every year, for example, as research universities graduate the next class of doctoral students, plaintiffs would be able to add new expert witnesses in a bid to strengthen their case. As new peer-reviewed studies are published, existing experts would seek to continuously revise their opinions or add new opinions. Such a system would trigger ever more discovery such that cases could effectively never proceed to trial. *See, e.g., Wash. Nat'ls Stadium, LLC v. Arenas, Parks and Stadium Sols., Inc.*, 192 A.3d 581, 585-86 (D.C. 2018) (concluding that trial court did not abuse its discretion in precluding

witness testimony where witnesses were not included on witness list as required by amended scheduling order, inclusion of witnesses would have prejudiced opposing party as trial was scheduled to start in a week and opposing party would not have had time to complete discovery for witnesses, and proposing party did not take any steps to put opposing party in a fair position such as arranging depositions). Regardless of whether a trial date has been set, civil defendants would be deprived of the opportunity to resolve claims against them, including by prevailing pretrial such as on summary judgment. We cannot, and do not, countenance such a system.

The trial judges imposed a limiting principle here. They properly exercised their discretion in enforcing the prior orders of their predecessor judges. *See*, *e.g.*, *Jung v. George Washington Univ.*, 875 A.2d 95, 102 (D.C. 2005) ("The law of the case doctrine prevents relitigation of the same issue in the same case by courts of coordinate jurisdiction." (internal quotation marks omitted)). Judge Burgess's scheduling order required both parties to produce "a complete statement of *all* opinions the[ir] witness[es] w[ould]express on general causation and the basis and reasons for them" (emphasis added). In managing this case, Judges Weisberg, Josey-Herring, and Irving acted well within their discretion in holding appellants to that order, and appellants do not challenge that order on appeal. We now take a closer look at the legal principles that the trial judges applied in each of their rulings.

### 1. Judge Weisberg's Order Denying Appellants' Motion for Additional Discovery

Judge Wesiberg did not abuse his discretion in denying appellants' motion for additional discovery and the addition of new experts. Judge Weisberg observed that Judge Burgess's order required the parties to disclose "a complete statement of *all* opinions the[ir] witness[es] w[ould] express on general causation and the basis and reasons for them" by a certain deadline and "was the same language that would have been used in a comparable order from a federal district court operating under Rule 702. *See* Federal Rule of Civil Procedure 26 (a)(2)(B)(i)" (emphasis added). Judge Weisberg was correct. *See* Super. Ct. Civ. R. 26; *cf.* Fed. R. Civ. P. 26.

Appellants' argument that Judge Burgess was "clear" that he wanted the parties to "'put *Daubert* aside' and strictly focus on the *Frye/Dyas* general acceptance standard" rests on a misinterpretation of the 2011 hearing. A straightforward reading of the transcript shows that Judge Burgess asked the parties to "[p]ut . . . aside" referencing the standard for admitting expert opinion testimony only so that he could get a better understanding of the difference between general and specific causation *for purposes of the hearing*. Nothing in Judge Burgess's decision to structure discovery in phases depended on any nuance of the *Frye/Dyas* standard—instead, he grounded his decision in the sound logic that general causation would prove dispositive if resolved against appellants.

Appellants also argue that "it was clear error to prohibit the broader degree of general causation discovery," including discovery of appellees' internal company documents. As Judge Weisberg observed, however, the focus of Phase 1 discovery was to "test whether [appellants] had the science to back up their experts' opinions on general causation," and if appellants did not—if they failed to qualify a single expert witness who could reliably establish a causal link between cell phone radiation and brain cancer—then the case would be over. The question whether appellants had reliable general causation evidence did not turn on access to appellees' internal documents, so the absence of such evidence would not have been the cause of appellants' inability to proffer reliable expert opinion testimony to allow them to move forward with the litigation. To the extent that appellants sought discovery of any internal general causation studies conducted by appellees, the trial court had already required appellees to turn those over. Moreover, while appellants lament the "prejudice . . . suffer[ed]" due to the change in the evidentiary standard, they fail to demonstrate such prejudice. Appellants fail to explain why they would have named different or additional experts, or why existing experts would have different or additional opinions, based on a different standard for evaluating experts' reliability.

Judge Weisberg exercised his discretion to permit limited supplementation in the two areas he deemed appropriate, allowing the parties' existing experts to

supplement the opinions in their original reports with studies published after 2013 and to revise how they articulated their previously expressed opinions so long as they explained why the change in the evidentiary standard necessitated such revisions. In so doing, Judge Weisberg gave appellants a "full and fair opportunity to present the[ir] case." *See Weisgram v. Marley Co.*, 528 U.S. 440, 444, 456 (2000) (affirming rejection of plaintiff's argument that, after court overturned plaintiff's trial victory due to inadmissible expert testimony, the court needed to remand to give plaintiff an opportunity to present new or better expert testimony). We discern no basis to disturb his ruling.

### *2.* **Judge Josey-Herring's Superseding Amended Order and Related Orders**

We likewise detect no abuse in Judge Josey-Herring's exercise of her discretion. While reasonable minds could disagree over the best interpretation of Judge Weisberg's order, i.e., whether it completely foreclosed new opinions and, relatedly, whether experts' incorporation of new topics in their supplemental reports amounted to raising new opinions or simply amounted to providing support for existing opinions, we decline to "substitute our judgment for that of the trial court." *Smith v. Alder Branch Realty Ltd. P'ship*, 684 A.2d 1284, 1289 (D.C. 1996). "[T]o sustain appellate review, [trial] courts need only adopt a reasonable construction of

the terms contained in their orders." *JTH Tax, Inc. v. H & R Block E. Tax Servs., Inc.*, 359 F.3d 699, 706 (4th Cir. 2004).

Judge Josey-Herring adopted a reasonable construction of the requirements of Judge Weisberg's supplementation order in concluding that it did not allow for new opinions or studies published before 2013 and permitted the revision of previously expressed opinions so long as appellants explained why the revisions were necessitated by the change in the evidentiary standard. Indeed, if Judge Weisberg intended for his supplementation order to allow for new opinions, then he might not have limited supplementation at all. He might have allowed for the inclusion of studies published before 2013 because new opinions may have needed to incorporate those studies. He might not have predicated any revision of the experts' articulation of their opinions on an explanation of the effect of the change from *Dyas/Frye* to Rule 702 because all new opinions would have been rendered in a *Daubert* regime divorced from *Dyas/Frye*. He might have explicitly allowed for new opinions that met the *Daubert* standard yet were not proffered before *Motorola II* because they did not meet the *Dyas/Frye* standard. It also stands to reason that Judge Weisberg might have allowed for the admission of new expert witnesses because any new expert would necessarily have offered a new opinion. That he did not do so supports Judge Josey-Herring's conclusion that his supplementation order posed a bar to new opinions, including from existing experts. Having "inquire[d] into the

reasonableness of the trial court's determination in light of the record," we conclude that Judge Josey-Herring's interpretation was a reasonable one. *Smith*, 684 A.2d at 1289. And even if we were of the view that Judge Weisberg's order could have been reasonably interpreted as allowing new opinions, Judge Josey-Herring's interpretation was equally reasonable, and we therefore affirm.

Judge Josey-Herring noted that while Judge Weisberg's order "permitted limited supplementation," it "did not authorize . . . a re-do of expert discovery" or "seek to give the parties an unfair opportunity to counter the [c]ourt's previous evidentiary findings after the fact." Accordingly, Judge Josey-Herring properly exercised her discretion in striking the portions of the supplemental reports of Drs. Plunkett, Liboff, Kundi, Belyaev, Panagopoulos, and Mosgoeller that expressed new opinions not previously offered, relied on studies that were available before 2013 but were not included in the original reports, or failed to explain how the change from *Dyas*/*Frye* to Rule 702 necessitated revisions in their original opinions.

Judge Josey-Herring's rulings did not, however, uniformly disfavor appellants. At times she denied or granted only in part appellees' motion to strike, permitting Drs. Plunkett, Liboff, Kundi, Panagopoulos, and Mosgoeller to reference studies that were otherwise prohibited provided that such references were consistent with the opinions in their original reports. Judge Josey-Herring also gave appellants

opportunities to provide supplemental briefing or hold an evidentiary hearing, such as in the case of Drs. Belyaev and Mosgoeller. Moreover, she permitted appellants' experts to cite to or reference a new pre-2013 study if the study was necessary to "meaningfully discuss[ ]" or provide context to a post-2013 study.

Appellants argue that Judge Josey-Herring "misappl[ied]" Judge Weisberg's decision and reiterate that Judge Burgess instructed them to "put *Daubert* aside" and focus on *Frye/Dyas*. For reasons already stated, those arguments do not persuade. Appellants also assert that Rule 26(a)(2)(B), on which they relied in their motion for reconsideration, specifically "contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report." Rule 26(a)(2)(B) governs the disclosure of expert testimony. As Judge Josey-Herring noted in her order denying reconsideration, Rule 26(a)(2)(B), by its terms, operates "[u]nless otherwise stipulated or ordered by the court." Several court orders had been issued governing discovery in this case. And Rule 26 does not operate to give parties free rein to defy those judicial rulings under the pretext of complying with expert disclosure requirements. Judge Josey-Herring was therefore correct in observing that appellants' "reliance on Rule 26 [wa]s misplaced and without merit."

Appellants also argue that "[s]upplemental opinions are not to be excluded by the court in the absence of credible prejudice to the opposing party." But "credible

prejudice to" appellees was in fact a primary motivation behind Judge Josey-Herring's striking decisions. She explained that supplementation was not meant to give appellants an "unfair opportunity" to re-do discovery or give them "an unfair tactical advantage" over appellees. Given her well-reasoned decisions, we decline to second guess her exercise of discretion.

### 3. Judge Irving's Order Denying Motion for Leave to Add a General Causation Expert to Phase I of Discovery and Related Orders

Judge Irving properly exercised his discretion in not admitting Dr. Portier as a new expert witness or otherwise revisiting a matter that was already settled, declining to depart from his predecessors' "prior well-reasoned court rulings." *See United States v. Davis*, 330 A.2d 751, 755 (D.C. 1975) ("Except in a truly unique situation, no benefit flows from having one trial judge entertain what is essentially a repetitious motion and take action which has as its purpose the overruling of prior action by another trial judge.") Judge Irving also properly weighed the *Tisdale* factors. As the ones seeking to amend their expert witness list, appellants bore the burden of satisfying the *Tisdale* factors under the totality of the circumstances. *See Tisdale*, 697 A.2d at 54; *see also Young v. Interstate Hotels & Resorts*, 906 A.2d 857, 861 (D.C. 2006). Appellants failed to carry their burden. Judge Irving found that appellants' "failure to acknowledge and distinguish the prior court rulings when evaluating the first factor [wa]s fatal" because appellees "would be greatly

prejudiced were the [c]ourt to issue an order directly circumventing Judge Weisberg's and Judge Josey-Herring's prior orders." He also determined that, under the fourth factor, "allowing Dr. Portier's testimony four months before the *Daubert* hearing [wa]s scheduled to begin would disrupt the existing schedule and detrimentally affect the orderliness and efficiency of any trial."

Under the standard for abuse of discretion, trial judges must make "[a]n informed choice . . . drawn from a firm factual foundation." *Brooks*, 993 A.2d at 1093 (first alteration in original and internal quotation marks omitted). We conclude that Judges Weisberg, Josey-Herring, and Irving met that standard. We therefore see no basis to disturb the trial judges' exercise of their "wide latitude . . . in overseeing discovery and the trial process." *Sowell v. Walker*, 755 A.2d 438, 446 (D.C. 2000).

### 4. Judge Irving's Order Granting Appellees' Motion to Exclude Appellants' Expert Testimony and Final Judgment Order

The same conclusion applies with respect to Judge Irving's exclusion of appellants' expert witnesses under Rule 702(a). Judge Irving properly evaluated the specialized knowledge of all of appellants' experts to determine if their proffered testimony would "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Some of Judge Irving's determinations under Rule 702(a) cut in appellants' favor: he qualified Dr. Kundi after noting that

appellees did not object to his testimony and qualified Dr. Mosgoeller as a "building block" expert.

Where Judge Irving did exclude the remaining expert witnesses under Rule 702(a), he did so after thoroughly reviewing their professional and educational qualifications, their scientific knowledge, and the substance of their opinions and determining that their proffered testimony would not assist the factfinder. Specifically, Judge Irving excluded the expert opinion testimony of Drs. Belyaev, Liboff, Panagopoulos, and Plunkett after finding that their proffered testimony was irrelevant or bore no relation to general causation, a reasonable ruling given that general causation was the dispositive issue at that stage of litigation. Moreover, where Dr. Plunkett was admitted only as a "support witness," Judge Irving excluded her testimony after excluding all the other witnesses. Accordingly, Judge Irving, in finding that these experts' proffered testimony would not aid the trier of fact, relied on the correct legal principles in excluding the experts' testimony under Rule 702(a).

We likewise identify no abuse of discretion in Judge Irving's application of Rule 702(b)-(d). For every expert, Judge Irving relied on the proper factors and applied the correct legal principles in determining whether their proffered testimony was "based on sufficient facts or data," was "the product of reliable principles and methods," and "reflect[ed] a reliable application of the principles and methods to the

facts of the case." Fed. R. Evid. 702(b)-(d). Judge Irving meticulously reviewed every expert's report to determine if their testimony passed muster. He ultimately found that they did not and articulated reasonable bases for each of those determinations.

Judge Irving found that Dr. Kundi's three-step methodology suffered from "analytical gap[s]." Dr. Belyaev failed to convince Judge Irving that he reliably applied the IARC methodology or faithfully used replication studies. Dr. Mosgoeller's opinion was in a "distinct minority," which "raise[d] a red flag" as to its reliability; he also failed to explain his weight-of-the-evidence methodology. Dr. Liboff similarly failed to explain his analysis of replication in his literature review. Dr. Panagopoulos's fruit-fly-exposure method was found to not be reliable because it was unclear how it applied to humans. In sum, Judge Irving acted well within his discretion in finding that appellants' experts failed to meet the standards set out in Rule 702(b)-(d). We therefore see no basis to disturb his ruling.

Finally, Judge Irving did not err in granting summary judgment in favor of appellees under Superior Court Civil Rule 56(f). After excluding all of appellants' expert witness, summary judgment for appellees logically followed. Appellants, in failing to qualify a single general causation expert, failed to show the existence of a genuine issue of material fact—namely that cell phone radiation causes glioma and

acoustic neuroma—and appellees were thus entitled to judgment as a matter of law. Granting summary judgment was therefore appropriate. *Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033, 1037 (D.C. 2014) ("It is appropriate to enter summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986))).

### III. Conclusion

For the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*

# APPENDIX

## LIST OF COUNSEL

*Jeffrey B. Morganroth* argued for appellants. The following were on the brief: *Jeffrey B. Morganroth*, *Mayer Morganroth*, and *Cherie Morganroth*, lead counsel for appellants Murray, Cochran, Agro, Keller, Schwamb, Schofield, and Bocook, and co-counsel for Marks; *James F. Green* and *Michelle Parfitt*, co-counsel for appellants Prischman, Kidd, Solomon, Brown, and Noroski; *Hunter W. Lundy*, *Rudie R. Soileau Jr.*, and *Kristie M. Hightower*, lead counsel for appellants Prischman, Kidd, Solomon, and Brown, and co-counsel for Marks; *Victor H. Pribanic* and *Matthew Doebler*, lead counsel for appellant Noroski; and *Steven R. Hickman*, co-counsel for appellants.

*Terrence J. Dee* argued for appellees. The following were on the brief: *Terrence J. Dee* (admitted pro hac vice), *Sarah A. Krajewski* (admitted pro hac vice), *Linda Coberly* (admitted pro hac vice), *Rand Brothers*, and *Dion J. Robbins* (admitted pro hac vice), counsel for Motorola Mobility LLC, Motorola Solutions, Inc. f/k/a Motorola Inc. and Motorola Inc.; *Kelley C. Barnaby*, *Scott A. Elder* (admitted pro hac vice), and *David Venderbush* (admitted pro hac vice), counsel for Cellco Partnership d/b/a Verizon Wireless; Bell Atlantic Mobile, Inc. formerly d/b/a Bell Atlantic Nynex Mobile; and Verizon Wireless Inc.; *Thomas Watson* and *Curtis S. Renner*, counsel for AT&T Inc., AT&T Wireless Services Inc., Cingular Wireless LLC, and related entities; *Seamus C. Duffy* (admitted pro hac vice), counsel for AT&T Inc., AT&T Wireless Services Inc., Cingular Wireless LLC, and related entities; *Paul J. Maloney*, *Matthew D. Berkowitz*, and *Kelly Cousoulis*, counsel for Audiovox Communications Corporation; *Howard D. Scher* (admitted pro hac vice) and *Andrew G. Hope*, counsel for Cellular One Group; *Michael D. McNeely*, counsel for Cellular Telecommunications & Internet Association; *Vicki L. Dexter* (admitted pro hac vice), counsel for CTIA – The Wireless Association, formerly Cellular Telecommunications & Internet Association; *Eric M. Leppo* and *Marcus K. Jones*, counsel for Cricket Wireless LLC; *Sean Reilly*, counsel for LG Electronics MobileComm U.S.A., Inc.; *Mike Stenglein* (admitted pro hac vice), *Richard W. Stimson* (admitted pro hac vice), *Lohr Beck* (admitted pro hac vice), *Lauren N. Smith* (admitted pro hac vice), counsel for Microsoft Mobile Oy; *Stephen T. Fowler* and *Francis A. Citera* (admitted pro hac vice), counsel for Qualcomm Inc. Sony Electronics Inc.; *Jaime W. Luse* and *Jung Yong Lee*, counsel for Samsung Electronics America, Inc., the successor by merger to Samsung Telecommunications America, LLC; *Charlie Eblen* (admitted pro hac vice) and *Shannon Schoultz*, counsel for Sprint Nextel Corporation f/k/a Nextel Communications Sprint Spectrum, L.P. d/b/a Sprint PCS; *Thomas T. Locke*, Counsel for Telecommunications Industry Association; *Steve Koh* (admitted pro hac vice),

*Michael Scoville*, *Daniel Ridlon* (admitted *pro hac vice*), and *Mary Rose Hughes*, counsel for T-Mobile USA, Inc.; and *Elizabeth M. Chiarello* (admitted pro hac vice), *Frank R. Volpe*, and *Eugene A. Schoon* (admitted pro hac vice), counsel for United States Cellular Corporation.